No. 2718.

T. A. MOODY v. THE STATE.

1. SWINDLING—EVIDENCE—CHARGE OF THE COURT.—See the statement of the case for evidence *held* to have been improperly admitted in a trial for swindling, inasmuch as it was both hearsay and immaterial to any issue in the case. But, had the same been admissible as bearing upon the question of intent, the charge of the court would be deficient in failing to limit it to that issue.

2. SAME—INTENT.—See the statement of the case for the evidence of the witness Hulen, *held*, though remote, to have been properly admitted as bearing upon the issue of intent.

APPEAL from the District Court of Grayson. Tried below before the Hon. D. H. Scott on exchange.

The conviction in this case was had under an indictment which charged the appellant with swindling, by converting to his own use certain funds belonging to the estate of. the minors Thomas A. and Etna M. Touchton, of which estate he was the guardian. The penalty assessed was a term of two years in the penitentiary.

H. Hulen was the first witness for the State. He testified that he lived in Gainesville, Cooke county, Texas, and was the present guardian of the estate of the minors Thomas A. and Etna M. Touchton. He was appointed as such guardian by the county court of Grayson county in the fall of 1884. Prior to that time, and while the defendant was the guardian of the said estate, the

witness had some business dealings with him.   At this point the objection was interposed that the record was the proper evidence of the business transactions of the defendant as the guardian of such estate.   The objection was sustained, and the witness was excused for the time being.

Robert Walker was next introduced as a witness for the State. He testified that he was the county clerk of Grayson county, Texas, and as such clerk was the custodian of all the books, records and papers pertaining to the estate of the minors Thomas A. and Etna M. Touchton.   The documents now in evidence were the true, genuine and original documents, records, papers, etc., pertaining to said estate.   The State then introduced in evidence the following instruments:

1.   The original application of Thomas A. Moody to the county court of Grayson county for appointment as guardian to the estate of the minors Thomas A. and Etna M. Touchton, filed January 16, 1884, which said application reads as follows:

"To the Hon. S. D. Steedman, County Judge, Grayson County, Texas:  Your petitioner, Thomas A. Moody, a resident of Grayson county, Texas, would respectfully show that Kirk B. Touchton died in Cooke county, Texas, November ——, 1883, leaving surviving him a widow, Mary E., and two children, Thomas A. and Etna M. Touchton, said children aged respectively four and two years; that said Kirk B. Touchton died without leaving any will.   Petitioner would further show that said minor children inherited from their said father, Kirk B. Touchton, property of about the value of five thousand dollars, consisting of money and monies due from life insurance companies and a small amount of other property.   Petitioner would further show that said minors and their mother are actual residents of Grayson county, Texas.   He would further show that said minors have no legal guardian, and that it is the desire of their mother that petitioner be appointed the guardian of the person and property of said minors.   Petitioner therefore, prays that he be appointed guardian of the person and property of said minor children above mentioned.

⋅ "THOMAS A. MOODY,
"per A. B. PERSON, Attorney."

Indorsed:
"To the Hon. S. D. Steedman, County Judge, Grayson County, Texas:  I hereby respectfully request that your honor appoint

Thomas A. Moody guardian of the persons and property of my minor children, Thomas A. and Etna M. Touchton.

"Very respectfully,

"MARY E. TOUCHTON."

2. The amended application of the said Thomas A. Moody to the county court of Grayson county for appointment as guardian, etc., filed February 11, 1884, which said amended application set out that, at his death, Kirk B. Touchton left property as follows: Life insurance policy number one hundred and eleven thousand and sixty-two, of Knights of Honor Lodge number one thousand seven hundred and one, Gainesville, Texas, for two thousand dollars, payable to Thomas A. Touchton; life insurance policy number fifty-five thousand five hundred and fifty-two, of the Texas Benevolent Association, for two thousand dollars, payable to Etna M. Touchton, and about five hundred dollars in money due said minors from Touchton, at Gainesville, Texas; that the said insurance companies were ready and prepared to pay the said policies upon the qualification of any person authorized by law to receive the payment; that said minors had no legal guardian, and that petitioner, who was their uncle, applied for appointment at the request of their mother.

3. The bond of Thomas A. Moody as the guardian of the estate of Thomas A. Touchton, minor, filed February 11, 1884. The said bond is in the sum of four thousand five hundred dollars, conditioned that the said Thomas A. Moody shall well and truly perform all the duties devolving upon him as such guardian. The said bond was signed by T. A. Moody as principal, and by S. C. Nisbet, L. C. Gilmore, C. F. Schweer, J. P. Klein and J. W. Gray as sureties, is approved by the county judge, and bears as indorsement the oath of the said Thomas A. Moody to well and truly perform the duties devolving upon him as such guardian.

4. The like bond of defendant as guardian of Etna M. Touchton, minor, filed on the same day, conditioned as the first bond and signed by the same sureties.

5. The petition of S. A. Touchton for the removal of Thomas A. Moody from the guardianship of the said minors and their estates, which reads as follows: "And now comes S. A. Touchton, the uncle of the said Thomas A. and Etna M. Touchton, the minor children of Kirk B. Touchton, and moves the court to remove Thomas A. Moody, the guardian of the persons and estate of said minors, for the following reasons, to wit:

"First, Because the said guardian has failed, neglected and refused to return within thirty days after qualification an inventory and list of the claims of the estate, as far as the said property has come to his knowledge since said appointment and qualification, as required by law.

"Second. Because he has good cause to believe and has been credibly informed that said Moody has collected the money due on the insurance policy, and has applied the same to the payment of debts contracted by said guardian in his own individual business for the purpose of speculating and advancing his own interests, and that the money collected on said policy has been and is being misapplied by said guardian to said business, and invested in cattle and placed in the Indian Territory, out of the jurisdiction of said court and beyond the limits of the State of Texas. Wherefore he prays that the said guardian be removed, and that he be required and compelled to pay all of the money collected on said policy, and all other moneys belonging to said estate, into said court, together with a list of the property of every kind belonging to said estate, instanter, and that the same be disposed in the future by the order of said court, as we will ever pray.

"S. A. TOUCHTON,<br>
"By CHARLES CRENSHAW, Attorney."

6. The citation issued upon the foregoing petition to the said Thomas A. Moody, issued May 30, 1884, and returned executed on June 17, 1884.

7. The following report, filed August 18, 1884:

"THE STATE OF TEXAS, ⎱ In County Court, August Term, 1884.
County of Grayson. ⎰

*Estate of Kirk B. Touchton.*

Now comes T. A. Moody, as guardian of Thomas A. and Etna M. Touchton, and makes this, his first annual report:

He charges himself with the amount of cash which he received as guardian of the above named children, to wit, four thousand five hundred dollars, which is all the property he ever received belonging to said minors.

He credits himself with the following amounts which he has paid:

To A. J. Thompson, clerk Cooke county court, as costs.
(Voucher 1) ............................................ $2 90
To Blanton & Blanton, attorney's fee. (Voucher 2)...... 25 00
To A. B. Person, attorney's fee for getting out guardianship papers, for which he will get voucher.. .......... 25 00
He has paid the following amounts to Mrs. Touchton, the
mother of said children, for their and her support while
taking care of them, which will appear by voucher 4,
herewith filed:
January 12, 1884 ...................................... 15 00
February 24, 1884...................................... 25 00
February 24, 1884...................................... 25 00
March 8, 1884......................................... 25 00
March 15, 1884........................................ 15 00
March 18, 1884........................................ 10 00
March 29, 1884........................................ 20 00
April 2, 1884......................................... 10 00
April 11, 1884........................................ 25 00
April 14, 1884........................................ 12 00
April 21, 1884.......... ............................. 10 00
April 28, 1884........................................ 10 00
May 10, 1884.......................................... 35 00
May 27, 1884.......................................... 15 00
June 7, 1884.......................................... 30 00
June 18, 1884......................................... 7 50
June 27, 1884......................................... 12 50
July 3, 1884.......................................... 10 00
July 14, 1884......................................... 10 00
Paid to Mrs. Touchton to assist in buying house for use
of herself and children, including said wards.......... 50 00
Paid R. R. Dulen for furniture for said house for Mrs.
Touchton and children................................ 50 00
Paid for improvement on place used by Mrs. Touchton
and children......................................... 15 00
Bought cow for use of said wards...................... 30 00

$519 90

He has allowed a claim in favor of Dr. S. E. Nisbet for
fifty dollars for medical services rendered his said wards $50 00
He has also allowed a claim for twenty-five dollars in
favor of C. N. Buckler, fees for advice and making this
report................................................ 25 00

He is entitled to his commission on four thousand five
  hundred dollars, which he received after he was ap-
  pointed guardian, which is............................$215 00

All of the above sums added together make a total of eight
hundred and nine dollars and ninety cents, which, deducted
from the principal received, to wit, four thousand, five hundred
dollars, leaves a balance due to the said wards of three thousand,
four hundred and ninety dollars and ten cents.

"Believing he had the right to do so, the guardian reports that
he invested the remainder of said money in cattle, sheep and
goats, but, owing to the decline in the market value of such
stock, and the loss by death of many of said animals, he is not
now able to turn said money into court, or to report the same as
being on hands. He has, or will soon have, one good note of
about six hundred dollars, arising from the sale of a portion of
the cattle purchased with said money, which note is perfectly
solvent, which he asks to be received by the court as part of the
assets of the said minors' estates, and that he receive a credit for
the same. That, in using this money in the way he did, he did
so by the advise of counsel, and, thinking, as he had given a
good bond for it, he had the right to use the same as he pleased.
He says that he will sell everything that he has and turn the
same into cash, if the court will grant him a little time to do so,
and thereby will be able to pay into court a large proportion
of the amount due said wards. He therefore prays for time
to make his final report, and that the above items be allowed
him.                          T. A. MOODY, Guardian."
                              Subscribed and sworn to.


8.   The application of Henry Hulen for appointment as guar-
dian of the estate of the minors Thomas A. and Etna M. Touch-
ton, vice Thomas A. Moody, removed, which application, filed
September 8, 1884, sets out the removal of said Moody, describes
the estates as described in the original application of said
Moody, less eight hundred and nine dollars and ninety cents
claimed by Moody in his first annual report, and recites that the
application is made upon the request of S. A. Touchton, the
uncle of said minors.

9 and 10.   The bonds of the said Hulen as guardian, signed by
said Hulen as principal, and by John T. Walker and E. C. Peery

as sureties, one filed October 16, 1884, and the other November 10, 1884, and each being in the sum of four thousand dollars.

11.   The order of the county court appointing Thomas A. Moody guardian of the estates of the said minors, entered on the eleventh day of February, 1884.

12.   The following order of the county court:

"Estate of Thomas A. Touchton et al., mi- } May 21, 1884.
    nors, Thomas A. Moody, guardian.

"It appearing to the court that a complaint has been filed in this court alleging a failure on the part of said guardian to report and file an inventory, and of his misappropriating the funds of said estate, it is ordered that said guardian be cited to answer said complaint within twenty days after adjournment of this court."

13.   The order removing the said Thomas A. Moody as the guardian of the said estates, which said order, caption omitted, reads as follows:

"It appearing to the court that T. A. Moody, guardian of the estate of Thomas A. and Etna M. Touchton, minors, has failed to file an inventory and make report of his acts as such guardian, and answer charges as required by order of this court, as shown in book N, at page 176 of the probate records of this court, it is ordered by the court that the said Moody be and he is hereby removed from the guardianship of said minors, and C. W. Moore is hereby appointed receiver of the estate of said minors, with the power to call upon said Moody for an account of all his acts as guardian of said minors.   It is further ordered, that said C. W. Moore enter into bond in the sum of eight thousand dollars as receiver of the estates of said minors.   It is further ordered by the court that citations issue to the sureties on the bond of the said Moody as guardian aforesaid, commanding them to appear at the October term, 1884, of this court, and show cause, if any they have, why judgment should not be had against them for all property and funds that have passed into the hands of said Moody as guardian, and for all damages resulting to the estates of said minors by reason of the acts and conduct of said Moody."

14.   The order of the county court appointing H. Hulen guardian of the estates of the said minors, entered October 13, 1884. The instruments numbered in this report as five, six and thirteen

are the instruments specifically involved in the first ruling of this court on this appeal.

H. Hulen was recalled by the State, and testified that he knew the father of the Touchton children in his life time. Their said father, Kirk B. Touchton, was a Knight of Honor, and belonged to the same lodge to which the witness belonged, and which was located at Gainesville. The said Touchton was drowned in Red river in December, 1883. His wife and children then lived in Gainesville. The life of the said Touchton was insured in the said Knights of Honor for the sum of two thousand dollars. When the defendant, who was the brother of Mrs. Touchton, the widow of Kirk Touchton, deceased, first began trying to secure the guardianship of the minors, he moved his said sister and her said children from Gainesville to Sherman. The witness was one of the trustees of the Knights of Honor lodge to which Kirk Touchton belonged. That lodge, about the first or middle of March, 1884, paid to the defendant, as the guardian of the estate of the said minors, a check for the sum of two thousand dollars, which was good for that amount at any of the banks, and was of the value of two thousand dollars in the lawful money of the United States. That check was paid to the defendant as guardian of the estates of the said minors, and as the property of, and for the benefit of, the said estates. When the said check was paid to the defendant, he, defendant, the widow of Kirk Touchton and the said minor children were living in Grayson county. When the defendant demanded the payment of the said life insurance policy, the witness and his co-trustees of the said lodge informed him that they had arranged to loan the money to a responsible party in Gainesville, on ample real estate security, at twelve per cent per annum interest, payable annually, until the oldest child should reach majority, and recommended the said loan to him as a safe and profitable investment of the money. Defendant refused to entertain the proposition, and did not make the loan recommended, but witness could not remember what he said about it. When the witness was appointed to the guardianship of the Touchton children, then about eight and six years respectively, he made a demand upon the defendant for the funds in his hands belonging to the estate. He only got an uncollectable note for seven hundred dollars on one Witherspoon, and seven hundred and sixty-six dollars and seventy-five cents from each of defendant's four bondsmen, except two hundred and sixty-six dollars and seventy-five cents of Doctor Nisbet's part,

30

which has not yet been paid. Witness recovered about one hundred and ninety dollars for cattle sold in Jack county. Witness was now the guardian of the Touchton minors, and was now living in Sherman.

J. W. Gray testified, for the State, that he knew the defendant. Before the appointment of the defendant as the guardian of the estate of Thomas A. and Etna M. Touchton, minor children of Kirk B. Touchton, deceased, was made out, the defendant came to witness and asked the witness to sign his guardian bond as surety, which, he said, was merely a form required by law; that he could not use or invest the funds of the estate except under the express order of the probate court, and that, when so used or invested by the order of the court, the said order would protect the bondsmen from loss. It was the recollection of the witness that defendant then said something about investing the estate funds in cattle under order of court. The witness, at that time, was somewhat interested in the defendant's affairs, and finally, when defendant appeared to encounter trouble in making the bond, the witness signed it as a surety. Defendant at that time owed the witness about one thousand four hundred dollars, to secure the payment of which he had executed to the witness a mortgage on one thousand head of sheep and goats, which he claimed to own in Jack county. At the same time the witness was on defendant's note to the City Bank of Sherman for one thousand dollars, and he, defendant, then owed the said bank about six hundred dollars besides. He then owned some wagons and eight or ten horses, and claimed to own three hundred head of cattle in the Dodge pasture, near Sherman. The bond was approved, and defendant assumed the guardianship of the estate.

Some time in May, 1884, witness heard some unfavorable reports about the defendant's management of the estate, and went to defendant about it. Witness knew that defendant had received two thousand dollars from the Gainesville Knights of Honor for the estate, and asked what he had done with that money, and what other moneys had come to his hands for the estate. He told the witness that he had not then used the money, and that he was then on his way to the court house to get an order on which to collect a policy of two thousand dollars due the minors from the Texas Benevolent Association at Waco. He said that he could collect the said two thousand dollars by getting the proper papers and going to Waco for it; and he did go to Waco, either on that night or on the next day. When he came back

from Waco the witness went to his house to see him, and asked him how he succeeded, and told him that Judge Bledsoe, the president of the Sherman City Bank, had refused to take Witherspoon on the debt owed by defendant at the said bank, including the one thousand dollar note on which the witness was security. Defendant replied that he did not collect the two thousand dollars in Waco, and that, if he had, he could not use it without an order of court. Witness then told him that he must arrange the money matter at the bank, and he replied that he would do so that day. On that same day the defendant, giving Witherspoon as security, got the money from the Merchants and Planters Bank, in Sherman, and paid off his debt at the City Bank. Witherspoon was a cattle man, who then and now owned cattle in the Panhandle, Greer county and the Indian Nation. He made his headquarters in Gainesville. The bondsmen soon found they would be held on the defendant's guardianship bond, and got together and had a conference with defendant. He agreed to surrender all of his property to the said bondsmen, who got only the cattle in Dodge's pasture, which, on actual count, numbered only two hundred and fifteen head, which was covered by a mortgage in favor of Witherspoon, who finally got them. It took all the sheep and goats, about two hundred and fifty head of each, to pay the mortgage of one thousand four hundred dollars which the witness held on them. On a compromise, concurred in and consented to by defendant, the bondsmen surrendered all claim against the cattle, and agreed to pay each (there being four bondsmen) seven hundred and sixty-six dollars and seventy-five cents, and Witherspoon gave his note for seven hundred dollars to H. Hulen, the newly appointed guardian. Witness paid his part. About fifteen head of cattle in Jack county were turned over to Doctor Nisbet, to be sold for the benefit of the estate. They realized about one hundred and ninety dollars. Defendant "showed up" no other property. He claimed to own that property when the witness signed his bond. He claimed that the cattle in the Dodge pasture numbered three hundred and eighty-five head, and when they counted out only two hundred and fifteen head, he offered no other explanation than that seventy head must have escaped from the pasture. He claimed the said cattle, sheep and goats as his property, and never as the property of the estate of the Touchton minors. He denied that he had any cattle in the Indian Territory. He told witness that he invested the estate money in cattle, but never

said how many he bought, how much he paid, from whom he bought, or where the said cattle were. He had never refunded a dollar paid by witness on his bond. His reputation for honesty was good up to his management of this estate.

Charles Dorchester testified, for the State, that he was the cashier of the Merchants and Planters bank of Sherman. The defendant deposited in the said bank, on the thirtieth day of May, 1884, the sum of one thousand nine hundred and eighty dollars in money, which, he said at the time of deposit, he got at Waco. The said money belonged to the estate of the Touchton minors, and was in the hands of the defendant as the guardian of said estate. On the same day the defendant, on his note, signed by Witherspoon as surety, borrowed of the bank the sum of one thousand five hundred and eighty dollars in money. All of the money referred to was deposited in the name of T. A. Moody. On that same day the defendant drew from the bank the sum of eight hundred and forty dollars. On the next day he drew, in five different checks, the sum of two thousand four hundred and ninety-nine dollars. He drew small amounts every day until June 9, when his account was found to be overdrawn to the amount of thirty-six dollars. On the fourteenth of the said June he deposited with the bank the sum of thirty-six dollars, previously overdrawn, and closed his account with the bank, and has had no account or deposit with it since. He never did have an account with the bank as guardian. His account was strictly individual. Witness did not know what he did with the moneys he deposited with, borrowed from and drew out of the bank. His checks were returned to him shortly after his account was closed. The deposit of one thousand nine hundred and eighty dollars was a draft on a Waco bank, for which, he said, he had discounted a two thousand dollar claim. Witherspoon paid the one thousand five hundred and eighty dollars obtained by defendant from the bank, and it was the understanding of the witness that he, Witherspoon, got the defendant's cattle.

J. P. Klein testified, for the State, that he was one of the sureties on the defendant's bond as guardian of the estate of the Touchton minors. As such bondsman he had paid seven hundred and sixty-six dollars and seventy-five cents, the amount assessed against him to make up the defendant's liability to the estate. The other three bondsmen paid a like sum. Witness had never been reimbursed, either in whole or in part, for the sum so paid

by him.   Witness, on or about May 24, 1884, heard that there was trouble brewing about the management of the estate, and went to see defendant about it.   He found the defendant at the court house door, going to the county judge to get authority to draw the two thousand dollars at Waco due from the Texas Benevolent Association.   Defendant then told witness that there was no truth in the rumors affecting the estate, and that he had as yet got no money belonging to the said minor children.   The defendant, when he asked witness to sign his bond, told him that such bond was merely a form required by law, and that the money coming to the estate could only be applied under order of court, which order would protect the sureties.   Witness knew of one visit that defendant paid to the Indian Territory in the spring of 1884, and he went to Jack county several times.   When he went to the Indian Territory on the occasion referred to by the witness, he said that he was going to look after the interests of his wards.   Witness did not know what the defendant did with the money of his wards.   Witness knew of no cattle owned by defendant except those he had in Grayson county.

Charles Crenshaw testified, for the State, that he was the attorney employed by the uncle of the minors, Thomas A. and Etna M. Touchton, to contest the defendant's application for the appointment of guardian.   After the defendant's appointment a contest was made on his bond, and he was compelled to execute a new bond.   Late in April, 1884, the witness met the defendant· in Sherman and told him that he, witness, had been employed by the uncle of the children to examine into current reports affecting his management of the Touchton estate.   Defendant replied that he had received the two thousand dollars due from the Gainesville Lodge of Knights of Honor, and about three hundred dollars from the estate of Kirk Touchton, deceased.   Witness directed him not to use any of those moneys either for himself or for the children, without an order of court, and warned him if he did his bondsmen would be held liable and he would commit a penitentiary offense.   When the witness, two or three weeks before he filed the complaint in the county court, told the defendant that he was reported to be buying cattle, sheep and goats with the money of his wards, he denied it.

Joseph Bledsoe testified that he was the president of the City Bank of Sherman, and held that position in 1884.   The defendant did not have an account at that bank as an individual, nor as guardian of any estate, in 1884, nor at any other time.   He at

one time owed the City Bank, and, on the thirtieth day of May, 1884, he settled that debt with money which he said he obtained from the Merchants and Planters Bank, on paper signed by Witherspoon as security. Witness had long known the defendant. Prior to this estate matter, the defendant's reputation for honesty was good.

C. N. Buckler testified, for the State, that he was the attorney of the defendant in this case, and acted as attorney for him in making his report as guardian. The witness knew of no other report of the defendant as guardian than that in evidence. Defendant made to witness, at the time of making that report, no statements other than those embodied in the report. Witness did not know what defendant had done with the money of the Touchton heirs. Cross examined, the witness stated that defendant came to his office on the day the report was made, and told witness that he wanted him to prepare the said report; that he was not able to turn the estate money into court, as he had invested and lost it. He said that he bought cattle, sheep and goats with it, but many of the goats and sheep died, and the cattle had greatly depreciated in the market. Witness then told defendant that if he could not report the money on hand, he had better report the facts as they existed, and accordingly witness prepared the report in evidence.

S. D. Steedman testified, for the State, that he was county judge of Grayson county, in 1884. He never as such county judge or otherwise authorized the defendant to use the funds belonging to the estate of the Touchton heirs, of which he was guardian. Witness told the defendant that he could apply the money only by order of the court, and that it must be invested or witness would charge him with interest on the same, and that he always exacted twelve per cent from guardians who failed or neglected to properly invest their trust funds. Defendant then said that he wanted to invest the money in cattle. Witness told him in reply that it might pay to so invest it, but that such investment would have to be approved by the court. He never applied to witness for an order to invest the funds in any way. Witness instructed the defendant fully as to the law which should govern his transactions as guardian. On his cross examination, the witness said that he told defendant that guardians had failed to invest the funds of their wards, and that he had taxed them twelve per cent interest on the funds on hand. He spoke of the case of J. H. Britton, the guardian of the Lemon

heirs, who reported certain uninvested trust funds on hand, and who, when the witness taxed him the twelve per cent interest, paid it.

The State rested.

S. C. Nisbet was the first witness for the defense. He was one of the sureties on the defendant's guardianship bond, and as such had paid the amount of the deficit assessed against him. He had known the defendant for eight or nine years, during which time the defendant had maintained an excellent reputation for honesty and fair dealing. The witness knew that the defendant purchased some cattle in 1884, and that the price of cattle declined greatly in the winter of 1883–4. Defendant, when he was removed from the guardianship of the estate of the Touchton minors, had about four thousand dollars worth of cattle in the Dodge pasture near Sherman. Witherspoon had a claim on them. They formed the basis of a compromise between the sureties and Witherspoon, the defendant and Hulen, his successor as guardian concurring. Defendant followed wood hauling after he was broken up in business, and continued to follow that business for some months after he was removed from the guardianship. The price of cattle began to fall in the winter of 1883. Witness was interested in the cattle business to some extent, and sold cattle in 1884 for fifteen dollars per head, for which during the previous year he could have gotten twenty dollars per head. Witness was at the defendant's ranch, in Grayson county in 1884, and saw the cattle belonging to the defendant, which, he was satisfied, were then worth at least four thousand dollars. In the spring and summer of 1884, the defendant bought fifty head of cattle from Gudgell, in Grayson county. After the removal of the defendant from the guardianship, all the cattle described were turned over to witness as the representative of the sureties, and witness sold them to Witherspoon. The sureties knew at that time that Witherspoon had a claim on the cattle, but they undertook the liquidation of that claim in order to secure the benefit of whatever margin over the amount of the debt could be realized. That amounted to seven hundred dollars, for which Witherspoon executed his note, which note the new guardian accepted in part liquidation of the claim against the bondsmen. A few cattle in Jack county were turned over to the sureties by the defendant. Defendant went to Jack county and brought those animals to witness. A few head were also found at large in Grayson coun-

ty, and were turned over to the sureties by the defendant. The fence around the Dodge pasture, in which defendant kept his cattle, was a very poor one. It was but three wires high, and some of the posts were down.

Cross examined, the witness said that he was not present when defendant bought the Gudgell or any other cattle, nor did he know the exact date of the Gudgell or any other purchase. Gudgell was living about three miles from Sherman, but witness could not explain why he was not in court to testify. He did not know whether the defendant bought the Gudgell cattle with money he saved from his grocery business or not. The twelve head of cattle found at large were animals that escaped from the Dodge pasture. Defendant executed to his sureties a mortgage on his property. Witness knew of no other property owned by defendant than that embraced in the mortgage. The witness still owed the guardian of the Touchton heirs two hundred dollars or over, which was amply secured. Defendant had never settled with or reimbursed the witness in secret. The mortgage referred to by the witness was introduced in evidence. It reads as follows:

THE STATE OF TEXAS, ⎫
    County of Grayson. ⎭

In consideration of the sum of one dollar to me in hand paid, the receipt of which is hereby acknowledged, I, T. A. Moody, the undersigned, have this day sold to S. C. Nisbet, of Grayson county, Texas, one thousand head of sheep and goats, now in Jack county, Texas, about eight miles from Jacksboro, and in the charge of Jesse Taylor; twent-eight head (more or less) of stock cattle in same county and place, branded TUT and TXM. The above mentioned sheep are sold on conditions hereinafter mentioned, and to the legal rights of J. W. Gray, under a bill of sale he holds for them. Three hundred and thirty-five head of cattle, some of which are in Mrs. Dodge's pasture, some in the city of Sherman, being stock cattle branded GUS. This includes all the cattle except sixty-five head sold to Mathews; ten head of horses, now in Grayson county, to wit, one roan horse, two bay horses, one five and the other six years old; two brown horses, one seven, the other eight; one roan, nine years old; one bay horse, eight years old; one bay mare (and colt), four years old; one two horse wagon and harness; nine acres potatoes and onions now in the ground, to be dug and marketed by Moody and the proceeds paid to Nisbet, he to hold the same on deposit,

subject to the conditions of the obligation. This sale and con-
veyance, however, is intended as a trust as the better securing
J. W. Gray, J. P. Schweer, G. P. Klein, L. G. Gilmore and S. C.
Nisbet, who, on or about the eleventh day of February, 1884,
subscribed their names upon two certain guardian's bonds, given
by said T. A. Moody as principal, in the county court of Gray-
son county, Texas, each for the sum of forty-five hundred dol-
lars, as guardian for —— Touchton and —— Touchton. Now, if
the said T. A. Moody, as guardian of said children, shall fully ac-
count, pay off and discharge all liabilities against him that may
now or hereafter arise under said bond, and receive full acquit-
tance for all sums that he may be liable to said children for, from
the proper person or legal authority, then in that case this trans-
fer and conveyance shall become null and void; but until such
settlement and payment is fully made, the said S. C. Nisbet, as
trustee for the sureties aforesaid, shall have the title and owner-
ship of the above property, and in case of default or failure to
account for and pay all or any part of said bonds, and these
sureties shall become liable to pay all or any part of said bonds,
then in that case the said S. C. Nisbet, trustee as aforesaid, shall
take possession of the said property, and the said T. A. Moody
agrees to surrender and deliver possession of same in good order
to said Nisbet, or any one thereunto authorized by him, and if
he deem fit, to sell the same at public auction or at private sale,
either with or without possession. In case, however, of public
sale, the same shall be sold in front of the court house door, in
the city of Sherman, Grayson county, Texas, first giving ten
days notice by posting the same, at the court house, or by per-
sonal notice to the said Moody. Either party may become the
purchaser of the said property. Such of said property as can be
conveniently brought to said sale shall be there exposed; such
as can not shall be sold as it runs. The proceeds of such sale,
whether public or private, after deducting costs and expenses,
shall be applied to the payment of any sum of money the said
sureties or either of them shall have to pay, or have paid, or be
liable to pay, on both or either of said guardian bonds. And it
is further stipulated that said property shall not be sold, encum-
bered, or removed out of the county of Grayson or Jack, until
the matters herein are settled. Any surplus over liabilities and
costs are to be refunded to the said Moody.

"Witness my hand, this 22nd day of July, 1884.

"T. A. MOODY."

Mrs. Mary E. Wood testified, for the defense, that she was the sister of the defendant, and the mother of the minors, Thomas A. and Etna M. Touchton, now the wards of H. Hulen. Witness brought the said children to Sherman about February 1, 1884. Defendant, who was dealing in cattle in 1884, told witness that he was going to invest her children's money in cattle. Mr. Persons was then the defendant's legal adviser. Witness and defendant discussed the investment of the children's money, and concurred in the opinion that the interests of the children could be best subserved by investing the money in cattle. Witness knew, as a matter of fact, that defendant purchased cattle after he got the children's money. Witness was living in Gainesville when her husband, Kirk Touchton, died. On her cross examination, the witness declared that she did not live on her children's money in 1884. She did not arrange with defendant to use that money. She did not agree with defendant that the said money should be used between her and defendant. She did not pay for her house with the money, nor any part of the money, of her children. She did not buy any furniture with their money. She did not use any of their money, except a few dollars with which she paid a doctor's bill, and to procure a few necessaries for the said children. Witness's attention was here called to the defendant's report as guardian, and particularly to the items of cash furnished her to the amount of about sixty dollars per month for six months, fifty dollars paid on her home, fifty dollars to Dulen for furniture, fifteen dollars for repairs, and thirty dollars for a cow. Asked to explain these matters, the witness remained silent until pressed by the State's counsel, when she replied: "I can't say about the cash, but he did buy me some furniture, and did pay fifty dollars on my house, which I afterwards sold, and did not pay any part of the money back to the children's estate. Mr. Touchton died in December, 1883, and I married Mr. Wood in August, 1884. The four thousand dollars insurance on Touchton's life was for the children in their own right. Defendant collected it all. I had two other children by a former husband. We lived on the money that the defendant gave us in the spring of 1884, and what I had. I had no other income except twelve dollars and fifty cents per month rents, and did not collect all of that."

Joseph Argo testified, for the defense, that he worked for the defendant up to and for some time previous to May 1, 1884. When witness left defendant's employ, defendant had three hundred and

twenty-five head of cattle in the Dodge pasture. The fence around that pasture was a very poor one. Witness clerked for the defendant when he was in the grocery business. Defendant bought the said cattle after he went out of the grocery business. The witness never, at any time, drove any cattle to the Indian Territory for the defendant, and he knew of none having been driven to that Territory for the defendant.

The defendant's wife testified, in his behalf, that she knew the defendant dealt in cattle in 1884. He had at least one hundred head of cattle in his lot in Sherman, during that year. He had no cattle in the Indian Territory, nor did he visit the Indian Territory during the year 1884. Defendant had no property left over his assignment to the sureties on his bond.

On her cross examination, witness said that defendant went into the grocery business after he quit the wood hauling business. She did not know of her own knowledge where he got the money with which he bought his stock of groceries. She did not know of her own knowledge of whom he purchased cattle, nor what, if he ever had any, became of his bills of sale.

Grove Henry testified, for the defense, that he had known the defendant since 1878. Defendant's business, at present, was that of clerk in the grocery store of his sister-in-law, Miss Laura Hopson. His reputation for honesty, prior to the transactions arising out of his management of the estate of the Touchton minors, was good.

R. E. Smith testified, for the defense, that he had known the defendant for several years, and knew that his general reputation for honesty in Sherman was good.

Messrs. Cole and Warrick testified that, prior to the troubles arising out of the estate matters, defendant's reputation for honesty in Sherman was good.

Charley Newton testified, for the defense, that he had the Dodge pasture rented during the year preceding the year it was rented by the defendant. The fence around that pasture was a poor one, and the witness, although he kept men on guard, lost thirteen head of cattle by escape.

Gus Moody, the defendant's brother, testified that he knew as a matter of fact that defendant had three hundred and twenty-five head of cattle in a pasture in the spring of 1884. He bought those cattle during that spring, which was after he retired from the grocery business.

Miss Laura Hopson testified, for the defense, that she owned

the grocery establishment which the defendant was now managing. Defendant had no interest in that business other than as employe on a salary. He never invested a cent in that business.

On her cross examination the witness stated that defendant began business for her in April, 1886, on one hundred and twenty-five dollars furnished by witness. She had since drawn about one thousand five hundred dollars from the establishment, and now owned the stock, which was a good one. She had paid and was paying defendant one thousand dollars per annum for his work. He was exclusive manager of that business. Witness managed the book store, in which she owned a one-half interest, worth about one thousand dollars. Defendant's wife knew all about her husband's business.

The defense rested.

A. B. Persons testified, for the State, in rebuttal, that he was an attorney at law, and was employed by defendant to get out the guardianship papers for him. Witness's employment ceased with the defendant's appointment. Witness never advised with defendant about the investment of the trust funds. Defendant once said something about investing the money in cattle, and witness referred him to the county judge.

The State closed.

Mrs. Mary Wood, recalled by the defense, in rebuttal, testified that she heard the defendant tell lawyer Persons that he thought of investing the trust funds in cattle. Persons replied, in effect, that he thought the investment a safe and good one.

Grove Henry, recalled, testified in behalf of the defense that the grocery store managed now by the defendant was conducted in the name of Miss Laura Hopson. The firm represented by witness had sold that establishment (Miss Hopson's) six thousand dollars worth of goods since defendant opened it; six hundred dollars worth of which was sold during the month preceding this trial.

The motion for a new trial raised the questions discussed in the opinion.

*Gilbert, Pasco & Russell,* and *C. N. Buckler* and *J. D. Woods,* filed separate briefs and arguments for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. It was error to admit in evidence against

the defendant the petition, citation and judgment referred to in bill of exception No. 3. These matters were hearsay, were in no manner relevant to the issue on trial, and tended in no degree to throw legitimate light upon that issue. They were not admissions, either express or by acquiescence, made by the defendant. We know of no rule of evidence which rendered them admissible for any purpose, and the recitals and statements therein contained are such as would be very likely to improperly influence the minds of a jury adversely to the defendant. (1 Greenleaf Ev., secs. 537, 538, 539; Pinckford v. The State, 13 Texas Ct. App., 468; Allison v. The State, 14 Texas Ct. App., 402.)

But, even if the said testimony had been admissible for the purpose named by the learned trial judge, it was material error to fail to instruct the jury that it could be considered by them for that purpose alone. (Pinckford v. The State, supra; Mayfield v. The State, 23 Texas Ct. App., 645; Whalen v. The State, Id., 598, and cases there cited; Maines v. The State, Id., 568.)

We are not prepared to say that the testimony of the witness Hulen is incompetent. As a circumstance bearing upon defendant's intent in relation to the fund in his charge, we think it was admissible, although remote.

With respect to the charge of the court, it is not materially erroneous except in the particular above mentioned. When considered as a whole, it sufficiently and correctly explains the law of the case.

Because the court erred in the admission in evidence of the petition, citation and judgment referred to in defendant's bill of exception No. 3, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*